UNITED STATES *v.* ARMOUR & CO. ET AL.

No. 103. Argued March 5, 1970—Decided June 1, 1970

*James van R. Springer* argued the cause for the United States. On the brief were *Solicitor General Griswold, Deputy Assistant Attorney General Comegys, Lawrence G. Wallace, Howard E. Shapiro,* and *Seymour H. Dussman.*

*Herbert A. Bergson* argued the cause for appellee General Host Corp. With him on the brief were *Howard Adler, Jr., James H. Kelley, Carol Garfiel Freeman,* and *Edwin E. McAmis.*

PER CURIAM.

The judgment is vacated and the case is remanded to the United States District Court for the Northern District of Illinois with instructions to dismiss the case as moot.

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL took no part in the decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

I dissent from dismissal of the case as moot.

In an historic consent decree the giant meatpackers were separated in a complete and continuing way from the general food business, the District Court retaining in the customary way the power to grant additional

relief, at the foot of the decree. Some years later motions to vacate the decree were made, and a judgment overruling them was affirmed by this Court. *Swift & Co.* v. *United States,* 276 U. S. 311. Later Armour and other meatpacker defendants, claiming that conditions in the food business had changed, sought modifications of the decree to relieve them from the structural bars against engaging in various aspects of the general food and retail meat business. That effort was also unsuccessful. *United States* v. *Swift & Co.,* 286 U. S. 106. Later, another attempt was made to obtain similar relief and it too failed. *United States* v. *Swift & Co.,* 189 F. Supp. 885, aff'd, 367 U. S. 909.

Armour is now the second largest meatpacker in the Nation. General Host is engaged in the food products business; it operates some 380 grocery stores, and some lodges, restaurants, and coffee shops. It is, in other words, engaged in lines of business from which Armour, as a party to the decree, would be barred, whether it did so directly or through stock ownership.

Against the resistance of Armour, General Host, which held about 16½% of Armour's outstanding stock, undertook to acquire at least 51% of it. The United States asked the District Court having jurisdiction over the meatpackers consent decree to make General Host a party under § 5 of the Sherman Act, 26 Stat. 210, as amended, 15 U. S. C. § 5. The refusal of the District Court to do so was, I think, error. After the District Court's ruling, General Host acquired 57% of Armour's stock. As a result, a species of the monopoly at which the consent decree was aimed was achieved.

General Host, it appears, has now transferred, pursuant to authority of the Interstate Commerce Commission, its Armour stock to Greyhound Corporation. It is alleged that Greyhound, like General Host, is engaged in food business prohibited to Armour under the

decree. The United States contends that Greyhound's control of Armour is as inconsistent with the decree as General Host's control. Greyhound, the United States states, owns other food interests that Armour could not own by virtue of the decree.

Neither General Host nor Greyhound could, of course, be held in contempt under the decree as it is written, for they were not parties. But they presumably knew of the decree and seemingly fashioned a procedure to circumvent it. The District Court had ample power under § 5 of the Sherman Act, to restrain General Host from frustrating the decree, for § 5 provides:

"Whenever it shall appear to the court before which any proceeding under section 4 of this title may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpoenas to that end may be served in any district by the marshal thereof."

General Host and Greyhound would have, of course, the opportunity to litigate the question whether their acts do interfere with the decree before any citation for contempt.

Moreover, Rule 25 (c) of the Federal Rules of Civil Procedure provides:

"In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. Service of the motion shall be made as provided in subdivision (a) of this rule."

Unless the District Court proceeds against General Host and Greyhound to supplement the decree, there

may be no remedy. Without the hearing I urge, they cannot be punished for contempt. Armour, though a party to the decree, was the victim of its violation, not a participant.

Under the decree Armour could not acquire either General Host or Greyhound. Yet the combination of meat-packers with food products arguably is realized whether Armour acquired them, or they, Armour. The misconception of the thrust of the decree by the District Court is evident in its statement that "General Host is not a large meat packer extending its monopolistic grasp toward the rest of the food industry and through the use of its already established distributing facilities, superior financial resources and other means making a dominant position felt, resulting in a restraint of trade by squeezing out present or potential competitors. Rather, General Host, a wholly separate corporate entity, has acquired some shares of Armour stock and evinced an interest in acquiring additional shares." The evil is in an interference with the decree through the combination of Armour's meatpacking power with the food lines of General Host—the precise type of evil at which the decree was aimed. And that evil is apparently present in Greyhound's acquisition.

Mr. Justice Cardozo speaking for the Court in the second *Swift* case said:

> "Whether the defendants would resume [their predatory practices] if they were to deal in groceries again, we do not know. They would certainly have the temptation to resume it. Their low overhead and their gigantic size, even when they are viewed as separate units, would still put them in a position to starve out weaker rivals. Mere size, according to the holding of this court, is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly . . . , but

size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past. The original decree at all events was framed upon that theory. It was framed upon the theory that even after the combination among the packers had been broken up and the monopoly dissolved, the individual units would be so huge that the capacity to engage in other forms of business as adjuncts to the sale of meats should be taken from them altogether. It did not say that the privilege to deal in groceries should be withdrawn for a limited time, or until the combination in respect of meats had been effectually broken up. It said that the privilege should be renounced forever, and this whether the units within the combination were acting collectively or singly. The combination was to be disintegrated, but relief was not to stop with that. To curb the aggressions of the huge units that would remain, there was to be a check upon their power, even though acting independently, to wage a war of extermination against dealers weaker than themselves. . . . Groceries and other enumerated articles they were not to sell at all, either by wholesale or by retail. Even the things that they were free to sell, meats and meat products, they were not to sell by retail." *United States* v. *Swift & Co.,* 286 U. S. 106, 116–117.

Mr. Justice Cardozo added that with the addition of groceries to meats, "[t]he opportunity will be theirs to renew the war of extermination that they waged in years gone by." *Id.,* at 118.

The same sentiment had previously been stated in the Senate by Senator (now MR. JUSTICE) BLACK in opposing the move of the meatpacking industry to relax the

decree. His fear was opening the doors to control of groceries and other food by the meatpackers: [1]

"If this court decree should be canceled and set aside by governmental consent, a giant food trust would not only be permitted but encouraged to rear its stupendous and ominous form over North, South, East, and West alike. Such governmental action will tacitly invite a monopoly of such size and power that with one stroke of a pen in some large financial center of the Nation this trust could lift the price of bread and meat from Maine to California."

Later he spoke of a financial prospectus based upon an expected modification of the decree: [2]

" 'With the expected modification of the consent decree, the big meat packers will enter the retail field anew, with nation-wide chains of grocery and other food shops, which will overshadow all the existing enterprises of that type in the United States.'

. . . . .

" 'As the nucleus of such chains of meat and grocery stores as they now contemplate the packers may take over most of the huge retail food store chains already existing, such as the big grocery chains, which now operate meat departments in 20,000 to 30,000 such shops in various parts of the country.

" 'It will pay every investor to scrutinize closely the increasing profit potentialities of the packing organizations.' "

The spectre of meatpacking and food products merging is as ominous today as it was then. It should not

[1] 72 Cong. Rec. 1239.
[2] 72 Cong. Rec. 9336.

matter how the predatory scheme is effectuated, whether one acquires the other or vice versa. On the facts here tendered, a case has been made out for making General Host and Greyhound parties and having a hearing to determine whether they or either of them has interfered with the decree. The question is not whether, as a *de novo* matter, the combination of either with Armour constitutes a violation of the Act. The issue whether General Host or Greyhound has interfered with the decree is a narrower one. If they and Armour had designed this scheme to avoid the decree, interference would be rather obvious. Why does it matter that General Host or Greyhound, acting without the connivance of Armour, achieves the same result unilaterally? A federal court has inherent power to prevent obstruction of its authority by acts of "force, guile, or otherwise," whether or not the person charged was or was not a party defendant. See *Mississippi Valley Barge Line Co.* v. *United States,* 273 F. Supp. 1, aff'd *sub nom. Osbourne* v. *Mississippi Valley Barge Line Co.,* 389 U. S. 579. For it is an historic equity principle that even a nonparty is bound "not to interfere with, and not to obstruct, the course of justice," or treat a court order as "unworthy of notice." See *Seaward* v. *Paterson,* [1897] 1 Ch. 545, 554. Cf. Rule 65 (d), Federal Rules of Civil Procedure.

I would not dismiss the case as moot. Rather, I would remand it to the District Court for a full hearing on the issue of interference.