UNITED STATES of America,
Plaintiff,

v.

The CLEVELAND TRUST COMPANY,
Defendant.

No. C70-301.

United States District Court,
N. D. Ohio, E. D.

July 30, 1974.

Robert D. Zuckerman, Frank B. Moore, Dept. of Justice, Cleveland, Ohio, for plaintiff.

Richard W. Pogue, Gerald W. Palmer of Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

This is an action brought to restrain alleged violations of Sections 7 and 8 of the Clayton Act, 15 U.S.C. §§ 18 and 19. Jurisdiction is predicated on Section 15 of the Clayton Act, 15 U.S.C. § 25. The sole defendant in this action is the Cleveland Trust Company, an Ohio corporation, and allegedly the sixteenth largest bank in the United States in terms of total trust assets. (Amended Complaint, para. 4.)

## I.

The Government's section 7 case,[1] as described in its amended complaint filed October 4, 1972, arises from defendant's alleged holdings, in various fiduciary accounts, of substantial aggregates of the common stock of both the Acme-Cleveland Corporation (Acme) and the Pneumo-Dynamics Corporation (Pneumo).[2] It is alleged that defendant, through its trust department, acquired, for purposes of section 7, approximately twenty-seven percent of the outstanding common stock of Acme and approximately fourteen percent of the outstanding common stock of Pneumo. As of September, 1968, defendant allegedly had full power to vote about twenty percent, and qualified power to vote about five percent, of Acme's stock. As of November 27, 1968, defendant allegedly had full power to vote all its Pneumo shares. (Amended Complaint, para. 15.)

Acme and Pneumo are characterized in the amended complaint as substantial competitors, on a nationwide basis, in the manufacture and sale of multiple spindle automatic bar and chucking machines (hereinafter referred to as "MSA machines"). These machines, and single spindle automatic bar and chucking machines (hereinafter referred to as "SSA machines") are defined in the amended complaint as "complex machine tools which perform a variety of integrated processes, such as cutting, polishing, boring, and reaming of ferrous and non-ferrous bars, tubes, castings, and forgings." (Amended Complaint, para. 6(a)).[3]

Both MSA and SSA machines are alleged to fall within a broad market, including some or all of the following types of horizontal and vertical metal cutting equipment: automatic tool rotating machines, numerically controlled lathes, center turning stations, turret lathes, tracer lathes, transfer lines and engine lathes, as well as certain types of forming equipment such as cold heading machines. (Amended Complaint, para. 6(a)). Sales of new, American MSA machines, however, are alleged to constitute an identifiable submarket and relevant "line of commerce" within the meaning of section 7.

1. Section 7 provides in pertinent part:
"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly."

2. The Government's original complaint was filed on March 26, 1970. This complaint set forth the same section 8 allegations as are contained in the amended complaint. The Government's section 7 cause of action, however, was much broader. Charged as violative of section 7 was defendant's alleged acquisitions of stock of *four* alleged competitors in a national market delineated as comprising the production and sale of "automatic screw machines." The four named companies were: The Acme-Cleveland Corporation; Pneumo-Dynamics Corporation; the

Warner & Swasey Company; and White Consolidated Industries, Inc. The "automatic screw machine" market was alleged to contain two submarkets: the nationwide manufacture and sale of "single spindle automatic screw machines," and of "multiple spindle automatic screw machines." The Government contended that the effect of defendant's alleged stock acquisitions in the four companies may be substantially to lessen competition among the companies in the broad "automatic screw machine" market, as well as in the two submarkets. Defendant filed an answer to the original complaint on June 17, 1970.
Thereafter, extensive discovery was pursued. The amended complaint and amended answer, filed on the same day, were the result of efforts by the parties to narrow the issues with respect to the Government's allegations under section 7.

3. SSA machines differ from MSA machines, *inter alia*, in that the former can tool only one metal piece at a time. It is alleged that "SSA machines are sold and shipped in interstate commerce." (Amended Complaint, para. 6(c).)

The amended complaint relates that sales of MSA machines, manufactured and sold in the United States (including tooling, attachments, accessories, and parts sold with originally produced machines) amounted to approximately $63,000,000. in 1969. (Amended Complaint, para. 6(b).) Acme, with sales of such MSA machines reaching $21,943,000. in 1969, accounted for about 34.8 percent, or the largest share of total sales. Pneumo, with sales approximating $9,014,000. in 1969, accounted for about 14.3 percent, or the fourth largest share. (Amended Complaint, paras. 7, 9(a).) The Government submits that if Acme and Pneumo had merged in 1969, the resulting company would have controlled 49.1 percent of dollar sales of MSA machines in that year, and that such a merger would have been violative of section 7. (Amended Complaint, para. 9(b).)

The Government avers that defendant does not hold the stock of either Acme or Pneumo "solely for investment" within the meaning of section 7,[4] but actually uses the voting rights of these shares to elect directors and to influence important management and policy decisions affecting the two companies. (Amended Complaint, para. 16.) It is not contended that defendant, by virtue of its alleged stockholdings, is in actual control of either of these companies. The amended complaint charges, however, that the effect of defendant's alleged stock acquisitions "may be to substantially lessen competition . . . in the following ways, among others: Actual and potential competition between Acme and Pneumo in the manufacture

and sale of MSA machines may be lessened." (Amended Complaint, para. 17.)

The Government prays that defendant's acquisition, retention, and use of the stock of Acme and Pneumo be adjudged violative of section 7; that defendant be required to divest itself of its alleged stockholdings in either Acme and Pneumo; and that defendant be ordered to withdraw from participation in the direction, control or management of either of these two companies. (Prayer for relief contained in Amended Complaint, paras. 1, 2, 3.)

The Government's section 8[5] allegations charge that defendant, through alleged agents, Mr. George F. Karch and Mr. Allan K. Shaw, has been and remains a member of the Board of Directors of Pneumo, the Warner & Swasey Company (W & S) and White Consolidated Industries, Inc. (White). Amended Complaint, para. 18).

The Government alleges that as of the date of the filing of its original complaint, Karch was Chairman of defendant's Board of Directors, and Shaw was defendant's Executive Vice President. (Amended Complaint, para. 5.) It is further alleged that all three companies, as of December 31, 1969, had capital surplus and undivided profits aggregating more than $1,000,000; that defendant does substantial banking business with the companies; and that the three companies "compete," for purposes of section 8, in the following respects: (a) Pneumo competes with W & S in the sale of MSA machines; (b) Pneumo competes with the Bullard Company (Bullard), a subsidiary of White located in Bridgeport, Connecticut, in the sale

---

4. Section 7 provides:
"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. . . . "

5. Section 8 provides in pertinent part:
"No person at the same time shall be a director in any two or more corporations,

any one of which has capital, surplus, and undivided ·profits aggregating more than $1,000,000, engaged in whole or in part in commerce . . . if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws."

of MSA machines; (c) W & S, in its sales of SSA machines, competes with Bullard in its sale of MSA machines; and (d) the G. A. Gray Company (Gray), a subsidiary of W & S, located in Cincinnati, Ohio, competes with Bullard in the sale of vertical boring mills.[6] (Amended Complaint, paras. 9(a), 11, 13, 14(b), and 16.)

The relief sought is as follows: (a) that defendant be adjudged to have violated section 8 of the Clayton Act; (b) that defendant be ordered to remove its agents from all but one of the Boards of Directors of Pneumo, W & S, and White; and (c) that further injunctive relief be granted foreclosing future violations of section 8. (Prayer for Relief contained in Amended Complaint, paras. 4, 5, 6.)

Defendant, in its amended answer, denies many of the essential allegations contained in the Government's amended complaint. Certain admissions, however, have been made. With respect to the Government's section 7 claim, defendant admits: (a) that as of November 27, 1968, it held, as a fiduciary, about fourteen percent of Pneumo's outstanding common stock (Amended Answer, para. 15);[7] (b) that the market and product definitions are as set forth in the amended complaint with new, American-made MSA machines constituting a "line of commerce" for purposes of section 7 (Amended Answer, para. 6); (c) that the Government's allegations setting forth 1969 sales figures of MSA machines and the respective dollar totals and percentages of such sales attributable to Acme and Pneumo are correct (Amended Answer, paras. 7, 9(a)); (d) that a merger of Acme and Pneumo in

1969 would have been violative of section 7 (Amended Answer, para. 9(b)); and (e) that as a fiduciary, defendant does exercise "the voting rights pertaining to such of the shares of corporations held by it in a fiduciary capacity as it is in a position to exercise with respect to election of directors." (Amended Answer, para. 16.)

As to the Government's section 8 claim, defendant admits: (a) that, as of the date of the original complaint, Karch and Shaw occupied the positions with defendant as alleged (Amended Answer, para. 5); (b) that Karch is on the Board of W & S, and Shaw is on the Boards of Pneumo and White (Amended Answer, paras. 10, 12, 14); (c) that all three companies, as of December 31, 1969, had capital, surplus and undivided profits aggregating more than $1,000,000. (Amended Answer, paras. 9(a), 11(a), 13(a)); (d) that Pneumo sold MSA machines in 1969 (Amended Answer, para. 9(a)); (e) that W & S sold MSA machines and SSA machines in 1969, and that its subsidiary Gray sold vertical boring mills in 1969 (Amended Answer, para. 11(a)); (f) that White's subsidiary Bullard sold MSA machines and vertical boring mills in 1969 (Amended Answer, para. 13(a)); and (g) that defendant does banking business with Pneumo, W & S, and White (Amended Answer, paras. 11(b), 13(b), 16).

## II.

The Government has filed a motion for summary judgment pursuant to Rule 56, F.R.Civ.P. contending that there is no genuine dispute as to any material facts pertinent to either its Sections 7

---

6. Vertical boring mills are defined in the amended complaint as "machine tools which principally perform the single operation of boring large metal pieces," and are "sold and shipped in interstate commerce." (Amended Complaint, para. 6(d).)

7. Defendant has admitted also, by way of answers to interrogatories, that as of March 26, 1970, the date of filing of the original

complaint, it held 1,065,752 shares of Acme in various fiduciary accounts holdings 2000 or more shares (Defendant's answer to the Government's first set of interrogatories, II 2e). This constituted approximately 28 percent of Acme's outstanding common stock, as announced on December 26, 1969 (Defendant's answer to the Government's first set of interrogatories, II 2.b).

or 8 claims, and that it is entitled to judgment as a matter of law. Defendant vigorously opposes this motion. Both parties have submitted briefs, affidavits, depositions, stipulations of fact, answers to interrogatories, and other papers and exhibits in support of their respective positions.[8]

Defendant has, in its turn, filed a motion to dismiss the Government's amended complaint, or, in the alternative, for summary judgment, on the ground that intervening events occurring since the initial institution of this action have mooted the Government's Section 7 and Section 8 claims. Oral argument was heard on all motions before the Court on March 26 and 27, 1974. Since defendant's motion raises a threshold issue going to the Court's jurisdiction to proceed further with this case, see DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); Liner v. Jafco, 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964), it shall be considered first.

## III.

The record reveals the following uncontroverted facts relative to defendant's motion. At the end of 1972, Pneumo consummated the sale to an unaffiliated buyer of the assets of its entire Machine Tool Group Division,[9] including all facilities engaged in the manufacture and sale of MSA machines.[10] (Deposition of Gerard A. Fulham dated July 17, 1973, at 10–11) (hereinafter Fulham deposition). The great majority of employees of Pneumo, previously involved in its MSA business, transferred to the employ of the new buyers (Fulham deposition, p. 23). Pneumo reported to its shareholders that it sustained, as a result of the sale, a pretax loss estimated at $4,012,912. (Fulham deposition, Exhibit 1, at 13, 21.)

Pneumo's most lucrative and important business interests are wholesale food distribution and food retail operations centered in the northeastern part of the United States. Such operations were reported in Pneumo's 1972 Annual Report to account for approximately seventy-seven percent of its corporate revenues. (Fulham Deposition, Exhibit 1 attached thereto at 2.) Pneumo derives substantial revenues and retains its largest investments, however, in a number of industrial operations (Fulham Deposition at 6). Some of its divisions and subsidiaries design and manufacture aerospace systems and components, as well as certain specialized industrial products, such as, inter alia, industrial fasteners, thermoelectric heat-sensing elements, thermocouple instruments, extension wire and accessories, and temperature resistance detention sensors (Fulham Deposition at 6, Exhibit 1 attached thereto at 24).

The decision to sell the Machine Tool Group Division, according to the uncon-

---

8. Motions have been filed by both parties directed at striking from the record certain exhibits. The motions are bottomed on various evidentiary grounds. Defendant objects to Government's exhibits designated 1, 2, 3, 10, 11, 22, 23, 24, 27, 28, 29, 30, 32, as well as portions of testimony contained in some depositions (Deposition of John S. Miller dated March 6, 1972, at 18–19; Deposition of Craig R. Smith dated February 23, 1972, at 15). The Government objects totally or in part to defendant's exhibits designated DX–Zimmerman, DX Mullins 1, DX Mullins 2, DX Bock, DX Gay, and DX Shaw. Due to the rulings made in this opinion, the issues raised by these evidentiary motions have, in large part, not had to be dealt with.

9. Pneumo's "Machine Tool Group Division" consisted basically of three "product lines" described as (1) "Cone Automatic," (2) "Blanchard Machine," and (3) "Springfield Grinder" with manufacturing essentially centralized in Windsor, Vermont (Deposition of John S. Miller dated March 6, 1972, at 49). MSA machines were produced in the "Cone Automatic" line.

10. Sold, too, was the capital stock of Cone Automatic Machine Co., Limited, an unconsolidated British subsidiary (Fulham deposition, Exhibit 1, at 21) and a manufacturer of MSA machines (Deposition of John S. Miller, dated March 6, 1972, at 52–53).

troverted deposition testimony of Mr. Gerard A. Fulham, Chairman of Pneumo's Board of Directors and its chief executive officer, "came about as a policy decision of management (Fulham Deposition at 20).[11] As he testified:

"... we felt we were too heavily committed to heavy goods manufacture, between the aerospace and machine tool group, and we should dispose of one or the other. We opted to dispose of the machine tool group because it wasn't doing well. That is the basis of it. We had a heavy debt structure, and we needed the money." (Id.) [12]

In his deposition, Mr. Fulham also testified that his company has no present plans to go back into the machine tool business (Fulham deposition, pp. 23, 76). He stated, in addition, that, in his opinion, it would be "very unlikely" if his company would ever do so again. When pressed for reasons for this view, he responded:

"... I suppose the first and most significant reason is that the machine tool business being as unprofitable as it was the last few years it would be a little hard to get the directors to agree we should go back into it. Secondly, and probably more importantly, the direction of the company is different. We are more and more moving away from this kind of heavy specialty machinery. In fact, we went into activities which are consumer oriented." (Fulham deposition, p. 24.)

The following facts are also not in dispute. Mr. Allan K. Shaw has been on the Board of Directors of Pneumo since 1961 and on the Board of Directors of White since 1965 (Defendant's answer to Government's first set of interrogatories, amended II 4.a). Shaw began his employment with defendant in 1932. In 1952 he was elected a vice president, and in 1963 he became head of defendant's Commercial Loan Department. In 1966 Shaw became defendant's senior vice president in charge of loans. From 1969–1972 Shaw served as defendant's executive vice president. (Defendant's answer to Government's first set of interrogatories, II 1.b; Affidavit of Allan K. Shaw dated September 28, 1973, paras. 2, 3, 4.)

On February 1, 1972, upon reaching the age of sixty five, Shaw retired as an officer of defendant, in accordance with the Cleveland Trust Pension Trust Agreement.[13] From that date until Feb-

---

11. Mr. Fulham did testify, however, that both Shaw and defendant played minor roles in the decision of Pneumo to sell its Machine Tool Group Division. He stated that Shaw, as a director of Pneumo, probably participated in the Board of Directors' approval of the sale. In addition, he noted that defendant, as one of Pneumo's lending banks, had to approve the sale of these assets. Mr. Fulham testified, however, that neither Shaw nor defendant had any active role in the decision to sell the Machine Tool Group Division, or in the actual implementation of the transaction itself (Fulham deposition at 21–23).

12. In his affidavit dated September 28, 1973, Shaw described the sale by Pneumo of its Machine Tool Group Division as follows:
"In November, 1972 Pneumo sold its Machine Tool Group (also known as the Cone-Blanchard business) to an independent purchaser. The fundamental motivations of the Board of Directors in approving the sale were that Pneumo was engaged in two high-

ly cyclical businesses (machine tools and aircraft landing gears), and that it was changing its overall corporate outlook to engage in food marketing in the Northeast. Further, the company was having financial difficulties. In order to generate cash to satisfy corporate obligations, the Pneumo management strongly recommended the Board of Directors approval of the sale of the Machine Tool Group (which included the Cone product line). I had no personal participation in the sale of the Machine Tool Group to the present owners."

13. "Normal Retirement Date" is defined in the Pension Trust Agreement as follows: "The first day of the month next following the date on which an employee attains his 65th birthday, provided he has completed at least 15 years of continuous service prior to his normal retirement date." (The Cleveland Trust Company Pension Trust Agreement, as Amended (1973) at 9, attached to, and authenticated by, affidavit of Richard P. Sherwood, dated February 1, 1974.)

ruary 2, 1973, Shaw served as a consultant to defendant. On February 3, 1973, Shaw severed all formal business ties with defendant. In an uncontroverted affidavit dated January 31, 1974, Shaw stated that he no longer maintains an office or files with defendant; that he is no longer listed in any of defendant's personnel directories; that he no longer reports to anyone associated with defendant, and that no one still employed by defendant reports to him; that he does not serve on any of defendant's committees, or attend any meetings of these committees; and that his only present ties with defendant are with regard to pension and other benefits to which he is legally entitled pursuant to the Cleveland Trust Pension Trust Agreement. Since his retirement, Shaw has continued to serve on the Boards of Directors of both Pneumo and White.

Mr. George F. Karch has served on the Board of Directors of W & S since 1953 (Deposition of George F. Karch dated September 20, 1973, at 8 [hereinafter Karch deposition]). Karch began his employment with defendant in 1926. He served as defendant's president from 1962–1966; as president and Chairman of the Board from 1967–68; as chief executive officer and Chairman of the Board from 1969–1972 (Defendant's answer to first set of interrogatories II 1.-6; Karch deposition at 5–7). He retired as an active officer on January 1, 1973. He remains, however, a member of defendant's Board of Directors and serves as a consultant (Karch deposition, *supra*, at 69). Since his retirement he has continued also on the Board of Directors of W & S.

### IV.

■ Federal courts are not "empowered . . . to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it." United States v. Alaska Steamship Co., 253 U.S. 113, 116, 40 S. Ct. 448, 449, 64 L.Ed. 808 (1920), quoting California v. San Pablo and Tulane RR Co., 149 U.S. 308, 314, 13 S.Ct. 876, 37 L.Ed. 747 (1893); *See also* North Carolina v. Rice, *supra*, 404 U.S. at 246, 92 S.Ct. 402, 30 L.Ed.2d 413; Caldwell v. Craighead, 432 F.2d 213, 218 (6th Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1617, 29 L.Ed.2d 123 (1971). Where a "case has . . . lost its character as a present, live controversy of the kind that must exist . . . to avoid advisory opinions on abstract propositions of law . . . ." Hall v. Beals, 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969), a court must stay its hand.

■ Certain principles are relevant in determining whether the public enforcement suit at bar has become moot. It is firmly established that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case . . . ." United States v. Concentrated Phosphate Export Assn., Inc., 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); *See also* United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944); United States v. Trans-Missouri Freight Assn., 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). Basically this is so because, in such circumstances, the defendant is "free to return to his old ways;" and a live controversy may remain which the public has an interest in having settled. United States v. W. T. Grant Co., *supra*, 345 U.S. at 632, 73 S.Ct. [894], at 897, 97 L.Ed. 1303. As was said in the *W. T. Grant case, supra:*

"... to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right . . . . The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement."

■ While mere voluntary discontinuance, without more, does not moot a case, it has been recognized that "[a] case might become moot if subsequent

events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." United States v. Concentrated Phosphate Export Assn., Inc., *supra*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344; *See also* Johnson v. New York State Education Dept., 409 U.S. 75, 76–79, 93 S. Ct. 259, 34 L.Ed.2d 290 (1972) (Marshall, J., concurring); S.E.C. v. Medical Comm. for Human Rights, 404 U.S. 403, 406, 92 S.Ct. 577, 30 L.Ed.2d 560 (1971). Thus, if by reason of intervening events occurring either before or after the commencement of suit it is no longer possible for the defendant to engage in the alleged illegal conduct, *See e. g.*, United States v. Hamburg-Amerikanische Packetfahrt-Actien Gessellschaft, 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387 (1915); United States v. Logan Co., 147 F.Supp. 330 (W.D.Pa.1957), or if, in addition to the conduct's discontinuance, there are strong circumstances clearly rendering recurrence entirely improbable, *See e. g.*, S.E.C. v. Medical Comm. for Human Rights, 404 U.S. 403, 405, 92 S.Ct. 577, 30 L.Ed.2d 560 (1971); United States v. Armour & Co., 398 U.S. 268, 90 S.Ct. 1723, 26 L.Ed.2d 226 (1970); In Re Penn Central Securities Litigation, 367 F.Supp. 1158 (E.D.Pa.1973); United States v. Insurance Board of Cleveland, 144 F.Supp. 684 (N.D.Ohio 1956) a conclusion of mootness is warranted.

■ It is clear that defendant has not voluntarily discontinued the alleged wrongful activity charged by the Government as violative of section 7. Indeed, defendant has not, in any manner, changed its course of conduct. It continues to hold, in a fiduciary capacity, substantial shares in both Acme and Pneumo. Defendant contends, however, that the effective withdrawal of Pneumo from the MSA market deprives the Government's section 7 case of essential factual underpinnings, and denudes the controversy between the parties, as defined in the amended complaint, of any actuality or significance whatever. The Court agrees.

There is no denying that crucial to the Government's section 7 case is continued substantial competition between Acme and Pneumo in the MSA market. Without such competition, the fact that defendant holds shares of stock in these companies may not possibly be viewed as violative of section 7, as such holdings could not conceivably give rise to illegal anti-competitive effects. Moreover, the circumstances surrounding Pneumo's withdrawal from the MSA market, coupled with its present policy orientation eschewing involvement in heavy specialty machinery enterprises, firmly attest to the complete improbability that Pneumo will re-enter the market, and again find itself in active competition with Acme. Accordingly, it is clear that intervening events have substantially altered the posture of the Government's section 7 case. It may no longer be argued that there is a probability, or even a possibility, of substantial lessening of competition in the MSA market as a result of defendant's alleged stock acquisitions in Acme and Pneumo.

The Government argues that its section 7 case may not be declared moot unless defendant can show that it cannot reasonably be expected to find itself again in a position of owning substantial shares of stock in two or more important competitors in a definable line of commerce, such as the manufacture and sale of MSA machines. This, it is asserted, cannot be done so long as defendant does not drastically change its present trust practices and policies. In so arguing, the Government ignores the reasonable bounds, and distinct nature, of the alleged section 7 violation defined in the amended complaint. As a consequence, the Government fails to recognize that, if this cause had remained viable, any decree that may have been entered would have been designed to operate on *that* section 7 violation. The decree would not have attempted "to accomplish in a single suit what should fairly be left to a later action when and if it proves necessary." United States v. National City Lines, 134 F.Supp. 350,

355 (N.D.Ill.1955); *See also* United States v. W. T. Grant Co., *supra,* 345 U. S. at 635, 73 S.Ct. 894, 97 L.Ed. 1303; United States v. Logan Co., *supra,* 147 F.Supp. at 335.

There is no denying that defendant may find itself in somewhat comparable situations with respect to Acme and another company, or indeed entirely different companies. But such possibilities lie well beyond the ambit of the Government's amended complaint, and the focus of any equitable relief that could have been fashioned here. The alleged illegal conduct described in the amended complaint is confined to defendant's relation with Acme and Pneumo. The relief sought is directed solely at those ties. Pneumo's withdrawal from competition with Acme in the MSA market has rendered such relief unnecessary.

A similar argument to that here being made was raised and rejected in United States v. Allied Chemical Corp., CCH Trade Cas. ¶ 71,193 (S.D.N.Y.1964). That case involved a challenge to the legality, under section 7, of a proposed merger agreement. Subsequent to the institution of suit by the Government, the defendants abandoned the agreement and moved to dismiss the suit for mootness. The Government opposed this motion on the ground, *inter alia,* that even if the precise merger being attacked was no longer forthcoming, either or both of the defendants may have been contemplating other similar mergers, against which relief would be necessary. The Government sought discovery as to these possibilities. The district court rejected this argument summarily, noting:

> "The possibility of other mergers by the parties . . . lies beyond the ambit of this complaint. While the Government says that it is likely that such may be forthcoming, I cannot see that the possibility of such mergers is in any way related to the agreement which formed the basis of this complaint."

It is worth observing that a finding that the Government's section 7 case is moot will not prevent the Government from challenging other possibly analogous situations resulting from defendant's trust activity.[14]

It is concluded that the Government's section 7 case, as defined in its amended complaint, is moot. "The controversy between the parties has . . . clearly ceased to be 'definite and concrete' and no longer 'touch[es] the legal relations of parties having adverse legal interests.' Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)." De-Funis v. Odegaard, *supra,* 416 U.S. at 317, 94 S.Ct. at 1706. *See also* Paramount Pictures Corp. v. Baldwin-Montrose Chemical Co., Inc., CCH Trade Cas. ¶ 71,678 (S.D.N.Y.1966), discussed *infra.*

In arguing that the Government's section 8 case is also moot, defendant points out that the Government's legal theory under section 8 is dependent, *in-*

---

14. The Government argues that it would be "unfair" to dismiss its section 7 case on the ground of mootness. The Government points out that the section 7 claim set forth in its original complaint would not even be arguably entirely moot because of the withdrawal of Pneumo from the MSA market. It is asserted that the original section 7 allegations were limited as a result of a "compromise agreement" with defendant in return for certain admissions. The Government maintains that defendant entered into the "compromise agreement" with knowledge that there was a possibility that Pneumo might sell its Machine Tool Group Division.

All of this is irrelevant to the determination here being made, *i. e.,* whether the section 7 case, as described in the only complaint now before the Court, has become moot. Clearly "no stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court . . . ." to forebear from passing on moot matters. California v. San Pablo & Tulane RR Co., 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747 (1893). Moreover, as previously stated in the text, nothing done here prevents the Government from commencing new litigation against defendant, if such is felt to be warranted.

*ter alia,* on two essential factual premises: (a) that Pneumo, White, and W & S are "competitors" within the meaning of section 8; and (b) that defendant, through "deputies" or "agents" sits on the Boards of Directors of the three companies.

Defendant contends that since Pneumo is no longer a competitor in any manner whatever in the machine tool industry and retains no capacity to be so again, the Government's section 8 claim has become moot insofar as it relates to that company. The Government points out, however, that section 8, on its face, prohibits interlocking directorates, not only between presently competing corporations, but also between corporations "that *shall have been theretofore . . . competitors. . . .*" (Emphasis added.) It is argued, in consequence, that the Pneumo portion of its section 8 suit for injunctive relief has not become moot.

One cited case is on point, Paramount Pictures Corp. v. Baldwin-Montrose Chemical Co., Inc., CCH Trade Cas. ¶ 71.678 (S.D.N.Y.1966), which involved a struggle for control of the Board of Directors of the Paramount Pictures Corporation. The purpose of the suit, as stated ·by the court, was to use section 8 as a vehicle to secure the removal of two dissident directors from the Paramount Board.

One of the dissidents was a director, at the same time of Paramount and the Baldwin-Montrose Chemical Co., Inc., a corporation engaged in the plastics and chemical business, but having a subsidiary, General Artists Corporation (GAC), a large talent agency.[15] The other dissident maintained simultaneous directorships on the Boards of Paramount and two other companies.

The court in *Baldwin-Montrose* dismissed plaintiff's complaint with prejudice. A number of reasons were given for this judgment. The court found that "none of the defendants has violated § 8 of the Clayton Act, because neither of the individual defendants serving as directors of Paramount has served at the same time as a director of any defendant corporation which is or has been a competitor of Paramount, within the purview of the statute."[16] Alternatively, however, the court ruled that even if it were assumed that "there was a violation of § 8 by one or both of the individual defendants by reason of Baldwin-Montrose's ownership of seventy percent of the shares of GAC, the sale of the said shares on November 30, 1965 effectively terminated the violation." The court reasoned in holding that no need for injunctive relief had been shown, and, in any event, that the case had become moot:

"Although Section 8 prohibits interlocking directorates between corporations 'theretofore' in competition, *there must still exist a present ability to resume any competition which may have ceased.* This conclusion appears consonant with the statute itself and all its judicial and administrative constructions." (Emphasis added.)[17]

In the instant case, there is no dispute, as previously discussed, that Pneumo has effectively divested itself of all interests in the machine tool indus-

---

15. This dissident had also been a director of GAC, but had relinquished this position before becoming a director of Paramount.

16. In reaching this conclusion, the court found that any direct competition between GAC and Paramount or any of its subsidiaries was *de minimis.* In addition the court ruled that such competition should not be considered in determining whether § 8 was violated by the holding of simultaneous directorships on the Boards of Paramount and Baldwin-Montrose. As the court stated:

"Subsidiary or parent corporations of those corporations in which there is an allegedly infringing interlocking directorate are not to be considered in determining whether competition exists between the directed corporations. This is especially so in this case where the activities of GAC are so completely unrelated to those of Baldwin-Montrose."

17. Relief was also denied, in another alternative holding, on the basis of certain additional considerations of equity.

try, and does not retain the necessary facilities to resume such operations in the future. It is no longer possible, therefore, for Pneumo to eliminate competition in that industry by means of an agreement with White and/or W & S resulting in a violation of any of the provisions of the antitrust laws. At best, it is conjectural whether Pneumo will ever be able to do this at some future date. This aspect of the Government's section 8 case, accordingly, has become moot.

Defendant next argues that even if it is assumed that it did sit on the Boards of W & S and White at the same time through Karch and Shaw, and that such conduct would be violative of section 8, the undisputed fact that Shaw has effectively severed all business ties with defendant, and now, it is asserted, sits on the Board of Directors of White in a capacity entirely independent from defendant, has resulted in the discontinuance of the challenged "interlock," and renders the balance of the Government's section 8 case moot.[18]

The Government argues that Shaw's retirement as an officer of defendant does not prove that his continued service on the Board of Directors of White is not as defendant's "deputy." It may well be that Shaw remains tied to defendant through a deep sense of good feeling, and continues to retain close contact with many of defendant's present personnel. Such informal links, however, are clearly not sufficient to demonstrate a continuing principal-agent relationship. The Government's theory of "deputization" under section 8 is largely predicated on Shaw (and Karch) being important officers of defendant, subject to its control and direction.

While it may be said, in consequence, that the alleged illegal "interlock" has been broken, this does not compel a finding that the Government's section 8 case, insofar as it relates to W & S and White, has become moot. The reason for the institution of the section 8 claim was not merely to force the removal of Karch and Shaw from all but one of the Boards of Directors of Pneumo, W & S and White, although this was one of its purposes. Rather, the principal object of the suit was to obtain consideration of the lawfulness of defendant's alleged conduct of placing "deputies" on the Boards of Directors of certain competing companies, and, if found illegal, to obtain injunctive relief aimed at effectively foreclosing defendant from such conduct in the future.[19]

The alleged mooting events here may not be characterized as voluntary discontinuance of the alleged wrongful conduct. Shaw was not compelled by defendant to remove himself from the Board of White. Indeed, he continues to be a director of that company, although no longer tied to defendant through formal business links. This being said, it still is nevertheless clear that defendant is so positioned that it is entirely "free to return to his old ways." United States v. W. T. Grant, *supra*, 345 U.S. at 632, 73 S.Ct. at 897, and seek again to place "deputies" on the Boards of W & S and White. Defendant has made no disclaimer of intention to do this in the future. Rather, it vigorously contests the sufficiency in law, as well as the factual predicate, of the Government's section 8 cause of action. Accordingly, it is not possible to find, on this present record, that "it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Unit-

18. Defendant does not press this argument with respect to Karch because he still retains formal business ties with defendant.

19. Indeed in the Government's amended complaint, it is broadly prayed "that Cleveland Trust, its officers, directors, agents, and all other persons acting on its behalf, be enjoined from permitting any of its agents from serving as a director of two or more competing corporations which are engaged in interstate commerce and have capital, surplus, and undivided profits aggregating more than $1,000,000." (Government Prayer for Relief contained in Amended Complaint, para. 6.)

ed States v. Concentrated Phosphate Export Assn., *supra,* 393 U.S. at 203, 89 S. Ct. at 364.

■ Nor is it presently appropriate, as a matter of discretion, to dismiss the Government's prayer for injunctive relief. Compare Treves v. Servel, Inc., 244 F.Supp. 773 (S.D.N.Y.1965); United States v. Newmont Mining Corp., 34 F.R.D. 504 (S.D.N.Y.1964) with United States v. W. T. Grant Co., 112 F.Supp. 336 (S.D.N.Y.1952), aff'd., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). There is clearly enough in this record to indicate that the Government may be able to prove, assuming a violation of section 8 is shown, "that there exists some cognizable danger of recurrent violation," United States v. W. T. Grant Co., *supra,* 345 U.S. at 633, 73 S.Ct. at 898, justifying permanent injunctive relief. Significantly, there is no dispute that defendant does banking business with both companies, and that defendant holds, in various fiduciary accounts, and subject to various restrictions and limitations, aggregates of stock in both companies.[20] The "climate for repetition of the challenged conduct exists . . . " Treves v. Servel, Inc., *supra,* 244 F.Supp. at 777. Defendant's motion, insofar as it relates to W & S and White, is denied.

## V.

■ Turning now to the Government's motion for summary judgment relative to what remains of its section 8 cause of action, it is at once apparent that the Government's novel theory under section 8 presents as an issue of law whether a corporation may ever be deemed a "director" within the meaning of the statute.[21] This is an issue which apparently has never been decided by any court. It need not, however, be resolved in passing on the Government's summary judgment motion. This is so because even if it were held that the term "director" in section 8 may be construed to include corporations, and not merely natural persons, summary judgment in favor of the Government is clearly inappropriate.

In support of its "deputization" theory, the Government cites a number of decisions holding *inter alia* that under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) a corporation may be deemed to sit on the Board of Directors of another corporation through a "deputy". *See* Feder v. Martin Marietta Corp., 406 F.2d 260 (2d Cir. 1969), cert. denied, 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970); Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962 (S.D.N.Y. 1965); *See also* Blau v. Lehman, 368 U. S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). No view is intimated as to what applicability, if any, these section 16(b) decisions have to the proper construction of Section 8 of the Clayton Act, a statute with different language,

**20.** Defendant has stated, in answers to interrogatories, that, as of March 26, 1970, it held 460,652 shares of W. & S stock in fiduciary accounts (Defendant's answer to Government's first set of interrogatories, II 2.-a); that as of March 18, 1970, it was informed that there were 3,690,868 voting shares of W & S outstanding (Defendant's answer to Government's first set of interrogatories, II 2.b); that as of April 16, 1969, it had sole voting power of 66,562 of such shares. (Defendant's answer to Government's first set of interrogatories, II 2.-d). With respect to White, defendant has disclosed that as of March 26, 1970, it held 13,357 shares in fiduciary accounts (Defendant's answer to Government's first set of interrogatories, II 2.b); that as of April 1970,

it was informed that White had 11,864,037 shares outstanding (Defendant's answer to Government's first set of interrogatories, II 2.a).

**21.** Both parties agree that a corporation may be a "person" for purposes of Section 8 of the Clayton Act. Section 1 of the Clayton Act, 15 U.S.C. § 12, defines "person" or "persons" as follows:

"The word 'person' or 'persons' wherever used in this Act shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country."

purpose, and history. At the same time, it is clear that in those cases it was recognized that "the issue of deputization is a question of fact to be settled case by case . . . ." Feder v. Martin Marietta Corp., *supra,* 406 F.2d at 263; Marquette Cement Mfg. Co. v. Andreas, *supra,* 239 F.Supp. at 967. The Government is not arguing here that the mere fact that both Karch and Shaw were officers of defendant necessarily means that they were serving on the Boards of W & S and White as defendant's "deputies" or "agents."

Without going into unnecessary detail, there is no doubt that the issue of "deputization" in this case, with respect to both Karch and Shaw, is entirely unsettled and unquestionably is in genuine controversy.[22] Meaningful analysis and treatment of the issue must await trial and a full record.

It is significant, too, that the government has not alleged or presented any evidence that White is, or has been, itself, in direct competition with W & S. Rather, the Government argues that the proscriptions of Section 8 may apply to directorships in two parent companies (White and W & S) where one of the parents (W & S) is in competition with a wholly owned subsidiary of the other (Bullard), both directly and through one of its own wholly owned subsidiaries (Gray). It is maintained that to preclude consideration of the subsidiaries in passing on whether, competition exists between White and W & S would be "to elevate form over substance." (Plaintiff's Reply to Defendant's Statement of Reasons Opposing Plaintiff's Motion for Summary Judgment, p. 11.)

What case law authority there is on the issue is neither consistent nor definitive. *Compare* Schechtman v. Wolfson, 141 F.Supp. 453 (S.D.N.Y.1956), aff'd, 244 F.2d 537 (2d Cir. 1957) *with* Paramount Pictures Corp. v. Baldwin-Montrose Chemical Co., Inc., *supra,* CCH Trade Cas. Para. 71,678.[23] One important commentator, however, has expressed the view that in determining whether competition between subsidiaries may be imputed to the parents for purposes of section 8, "[w]here the major policies of the subsidiaries are dictated by the parents, it would seem that there is a strong case for holding the directorships unlawful. . . ." Kramer, Interlocking Directorships and the Clayton Act After 35 Years, 59 Yale L.J. 1266, 1268 n. 11 (1950); *But see e. g.,* J. von Kalinowski, 3 Antitrust Laws and Trade Regulation, § 20.02[3] n. 40.

In the instant case, the present record provides no clear picture of the control exercised by the two parent companies over the major policies of their respective subsidiaries. The Government has submitted evidence that both Bullard and Gray are wholly owned subsidiaries, strongly tied to their parents. (*See* Affidavit of Raymond G. Dauscher, dated November 30, 1973; Deposition of Woods King, Jr., dated January 12, 1973 at 27–28, 38–40). Shaw, however, in his affidavit dated September 28, 1973, paras. 18, 19 stated that he could recall no instance in which Bullard policy matters were ever discussed at meetings of the White Board of Directors.[24] Karch, in his deposition, at 27, indicated that policy questions concerning Gray are infrequently considered by the W & S Board of Directors. Determination of the nature of control exercised by the two parent companies over their subsidiaries, and assessment of the significance that such control may have to the Government's section 8 case, must also await trial, and a full record.

## CONCLUSION AND ORDER

1. Defendant's motion is granted insofar as the Government's section 7

---

22. This is even if the Court did not consider an exhibit submitted by defendant bearing relevance to this issue, and against which the Government has entered objections, *i. e.,* DX–Mullins–1.

23. See note 16, *supra.*

24. The Government's motion to strike para. 18 of Shaw's affidavit is denied.

cause of action, and that part of the Government's section 8 cause of action relating to Pneumo are dismissed without prejudice.

2. The Government's motion for summary judgment relative to what remains of its section 8 cause of action is denied.

It is so ordered.