302

In the Matter of PENN CENTRAL
TRANSPORTATION COMPANY,
Debtor.

In re ISSUANCE of TRUSTEES'
CERTIFICATES.

No. 70-347.

United States District Court,
E. D. Pennsylvania.

Jan. 15, 1971.

See also, D.C., 315 F.Supp. 1281;
324 F.Supp. 435; 325 F.Supp. 294.

Robert W. Blanchette, New Haven, Conn., and Edwin P. Rome, Philadelphia, Pa., for Trustees.

Richardson Blair, Philadelphia, Pa., for Girard Trust Bank and other indenture trustees.

James Wm. Moore, New Haven, Conn., Spencer Ervin, Jr., Philadelphia, Pa., and Joseph Auerbach, Sullivan & Worcester, Boston, Mass., for New York, New Haven and Hartford Trustees.

Jonathan Harkavy, Carter, Ledyard & Milburn, New York City, for United States Trust Co. of New York.

William E. Nelson, United States Dept. of Justice, for the United States.

Matthew J. Broderick, Philadelphia, Pa., for Penn Central Co.

Nathan Lavine, Adelman & Lavine, Philadelphia, Pa., for Security Ins. Co. of Hartford.

## OPINION IN SUPPORT OF ORDER NO. 124 AUTHORIZING THE ISSUANCE OF TRUSTEES' CERTIFICATES

FULLAM, District Judge.

The question before the Court is whether the Trustees should be authorized to borrow $100 million by issuing trustees' certificates, pursuant to § 77(c) (3) of the Bankruptcy Act, 11 U. S.C. § 205(c) (3), to be guaranteed on behalf of the United States by the Secretary of Transportation pursuant to the provisions of the Emergency Rail Services Act of 1970, P.L. No. 91–1510, which became law on January 8, 1971.

The Trustees' application is opposed by the Trustee of the New York, New Haven & Hartford Railroad Company (hereinafter "NH Trustee"); the Indenture Trustees of various mortgages; The Security Insurance Co. of Hartford, a shareholder of the parent company of the debtor, and other shareholders. The institutional investors' representatives, and the parent company of the debtor, decline either to approve or oppose the application. The Trustees' application is supported by the Justice Department.

In theory, two separate, but related, questions are presented: whether the issuance of certificates should be authorized, and whether the guaranty should be sought. But since it is abundantly clear on this record that trustees' certificates cannot be sold without such government guaranty, both questions will be considered together.

### I—*Necessity*

The immediate cause of the debtor's § 77 filing was the exhaustion of its liquid assets and credit, coupled with continuing operating losses. By virtue of the deferments made possible by the reorganization proceeding, and as a result of various economies and improvements achieved by the Trustees and present management, the debtor has been able to continue to function. By November 1970, it appeared that, in normal course, the railroad would be able to operate until March 1971 before experiencing a further cash crisis. However, such projections were based on continuation of existing wage levels, a prospect which all concerned recognized was doubtful, in light of the wage negotiations which had been in progress for several months. On December 10, 1970, in order to halt the nationwide rail strike then being instituted, Congress mandated an immediate retroactive wage increase. This has resulted in the further depletion of the debtor's cash at the rate of about $6 million per month, and the inevitable necessity of expending the further sum of approximately $50 million, not later than mid-February 1971, to cover retroactive payments. The total additional cash drain attributable to this wage increase will be about $75 million as of March 31, 1971.

It is desirable for the debtor to maintain a minimum balance of about $30 million in cash on hand at all times, but the debtor can operate adequately with a minimum cash balance of $20 million. The fluctuations in "float" occasioned by normal operations render it unwise to allow cash to fall below $20 million on any given day. The Trustees reported at the hearing that the debtor now has about $18.6 million in cash on hand, and even this precarious balance was made possible only by deferring payments due under certain equipment obligations to the full extent of the applicable grace periods. These equipment payments cannot be deferred beyond January 28, 1971. On or shortly after that date, rail operations will necessarily cease, unless additional cash is made available in the meantime. Indeed, preparations for an orderly shutdown would have to be implemented almost immediately.

The Trustees have assiduously explored all other conceivable alternatives, but it is clear that the issuance of trustees' certificates represents the only feasible source of the required funds; and, as noted at the outset, it is also clear that such certificates cannot be sold in the absence of federal guaranty.

It is of course correct that the debtor, directly or indirectly, owns valuable interests in non-railroad properties of various kinds. The Trustees are committed to a policy of disposing of all such non-essential properties as promptly as can prudently be done. While this circumstance greatly improves the long-range prospects, it does not provide the solution to the immediate problem. Substantially all of these assets are heavily encumbered; and, for a variety of reasons which need not be detailed here, the debtor's equity simply cannot immediately be converted into cash which would be available to support its operations.

## II—*Best interests of estate; feasibility of successful reorganization*

On December 18, 1970, I entered an order (No. 95) extending until March 22, 1971 the time for filing a proposed plan of reorganization. When this extension was granted, the wage increase had been legislated, but the Emergency Rail Services Act of 1970 had not yet been enacted. I pointed out that, while there were many uncertainties standing in the way of any firm conclusions as to the likelihood of successful reorganization, a conclusion of probable failure was unwarranted, and that further time for evaluation of the situation should be granted. Although the parties now objecting to the proposed issuance of trustees' certificates do not dispute the propriety of this extension of time, they nevertheless contend that the Trustees' application should be denied, on the theory that there is no present assurance that a successful reorganization can be accomplished.

Preliminarily, it should be observed that one of the principal uncertainties which existed at the time the extension was granted, namely, the possibility of meeting immediate cash needs, would be removed by the approval of the present application.

In the present proceeding, the Trustees, speaking through Mr. George P. Baker, former Dean of the Harvard Business School, and a nationally recognized expert on transportation matters, testified that, in their best business judgment, there is a reasonable prospect that the debtor can be restored to viability within three or five years. "Viability", in this context, means achieving the ability to generate some income available for the payment of fixed charges.

The Secretary of Transportation, after consultation with the Interstate Commerce Commission, has made a specific finding, in conformity with the Emergency Rail Services Act of 1970, that "the railroad can reasonably be expected to become self-sustaining."

The objectors have offered no evidence whatever to contradict these weighty opinions. Their contention seems to be that, because operating losses in the recent past have been on the order of $200 million to $300 million per year, and because the Trustees anticipate the necessity of obtaining further cash in order to achieve viability, the enterprise should be abandoned. While the losses are large in the abstract, they must be measured against the factual background of a corporation which produces annual gross revenues in excess of $1.5 billion. It is immediately apparent that small percentage shifts on either side of the balance sheet would assure profitable operation. This is not a situation of attempting to require the railroad to be operated permanently at a loss. Cf. Brooks-Scanlon Co. v. Railroad Commission, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920); New York, N. H. & H. R. Co., etc., Bondholders' Committee v. U. S., 289 F.Supp. 418 (S.D.N.Y. 1968).

Fundamental statutory and administrative changes, affecting such matters as rate-making, abandonments or subsidization of uneconomical lines, and labor arrangements, will undoubtedly be required if continued viability of railroads, especially Eastern railroads, is to be assured. The National government at all levels has demonstrated an increasing sensitivity to the need for prompt corrective action. I am not prepared to assume that the necessary changes will not be forthcoming.

On the entire record to date, I am satisfied that, if the present application is granted, it appears reasonably likely that this railroad can ultimately be successfully reorganized.

### III—*Objections*

The NH Trustee opposes the granting of this application. The arguments he advances embrace all of the arguments advanced by the other objectors, and also include various additional arguments based upon the unique and complex relationship between the New Haven Estate and the debtor.

■ The factual background is fully set forth in the opinion of the Supreme Court in the New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed. 2d 691 (1970). Briefly, ICC approval of the merger between the New York Central and Pennsylvania Railroads was conditioned upon the inclusion of the New Haven in the merged company (344 ICC 25). As the "first step" of a plan of reorganization. the New Haven reorganization court (United States District Court for the District of Connecticut) approved the transfer of the New Haven assets to Penn Central, in exchange for payment of the consideration which, without prejudice to the right of the parties to seek judicial review of the sale price, had previously been tentatively fixed by the ICC. On December 31, 1968, the transaction was consummated, to the extent that the assets were conveyed to Penn Central, and the NH Trustee received payment in the form of a $34 million mortgage, some 950,000 shares of Penn Central common stock, then valued at $83.1 million, and the assumption by Penn Central of certain New Haven obligations. The parties then proceeded to litigate, *inter alia*, the adequacy of the consideration, in concurrent proceedings before the reorganization court and before a three-judge court in the Southern District of New York. The Supreme Court, reviewing both actions, concluded that the correct price to be paid for the New Haven as-

sets should be $29,035,899 greater than that previously fixed by the ICC; and that the correct valuation of the Penn Central stock should be reconsidered. The Court held:

"Further proceedings before the Commission and the appropriate federal courts will be necessary to determine the form that Penn Central's consideration to the New Haven should properly take and the status of the New Haven Estate as a shareholder or creditor of Penn Central." (399 U.S. at 489, 90 S.Ct. at 2108).

The opinion was handed down on June 29, 1970, eight days after the filing of the reorganization petition in this case. In that connection, the Court pointed out in a footnote:

"On June 21, 1970, the Penn Central Transportation Company filed a petition for reorganization under § 77 of the Bankruptcy Act, 11 U.S.C. § 205, in the United States District Court for the Eastern District of Pennsylvania. *Whether the financial obligations dealt with in the present opinion may become subject to modification in or because of those proceedings is a question with which the present opinion in no way deals.*" (emphasis added)

In view of this language, there is plainly no merit in the argument which seems to underlie all of the various contentions of the NH Trustee in this case, namely, that because the price to be paid for the New Haven assets was fixed by the Supreme Court on the theory that any lesser price might constitute the confiscation of the New Haven bondholders' property without due process of law, the rights of the NH Trustee to receive this payment remain totally unaffected by the present reorganization proceeding.

■ All of the creditors of the Penn Central Transportation Company, including the NH Trustee, are entitled to the protection of the Constitution against confiscation of their property without just compensation. Any plan of reorganization which contravenes these con-

stitutional rights will not be permitted to stand. But it is the very essence of a § 77 proceeding that all such questions are to be resolved in connection with the reorganization plan, not at the outset, so as to frustrate the entire proceeding. "The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interests may or may not be served by the destructive move." Penn-Central Merger and N&W Inclusion Cases, 389 U.S. 486, 511, 88 S.Ct. 602, 614, 19 L.Ed.2d 723 (1968).

It is neither necessary nor desirable to attempt to decide at this point the precise nature of the rights of the NH Trustee. It would seem that he is a lien creditor of the debtor, at least to the extent of the $34 million mortgage (which is a first lien as to some of the former New Haven assets, and a junior lien as to others). As to the balance of the New Haven claims, the NH Trustee may be either an unsecured creditor, a lien creditor, or the holder of equity in the parent company. There are complex threshold problems of jurisdiction to determine the various legal and factual issues which may be involved. But whatever the ultimate outcome may be, the NH Trustee like any other party is subject to § 77(j) and all of the other provisions of § 77 of the Bankruptcy Act.

Unless and until it appears that there is some likelihood, not only that the debtor cannot be successfully reorganized, but also that the liquidation value would be insufficient to protect the interests here asserted, there is no legal impediment to the granting of the present application. The record negatives any such finding, and no one has asserted that such a finding would be justified.

■ Although it is clear that the only possible prejudice to the objectors' interests stems from the creation of indebtedness having a superior lien, pursuant to § 77(c) (3) of the Bankruptcy Act (the validity and constitutionality of which no one now challenges), the NH Trustee purports to attack the constitutionality of the guarantee legislation, the Emergency Rail Services Act of 1970. There is no merit to this challenge.

The Trustee argues that § 3(b) (1) of the Emergency Rail Services Act of 1970, requiring that the proceeds from the sale of the guaranteed certificates must be used solely to meet essential operating expenses, means that the borrowed funds cannot be used to pay the New Haven claims. This argument amounts to the untenable assertion that the New Haven claims are entitled to immediate payment, and have priority over the expenses of current operation, all other administrative expenses, all other creditors, and the public interest in continued rail service.

The NH Trustee further argues that the § 3(b) (3) provision requiring that "the proceeds from the sale of assets are to be used to the fullest extent possible for essential operating expenses" means that former New Haven assets under lien might be sold and the NH Estate unconstitutionally deprived of the proceeds. But the phrase "to the fullest extent possible" obviously connotes a recognition of legal and constitutional limitations.

A further argument is made that the option provision contained in § 3(b) (4) of the Act makes it possible that the Secretary of Transportation might be able to acquire former New Haven assets and be deemed to have paid for them previously, by making good his guaranty, after the loan proceeds have already been dissipated. There are several reasons for rejecting this argument: In the first place, I do not construe the language of § 3(b) (4) as permitting piecemeal acquisitions by the Secretary. In the second place, the statute expressly provides that "the terms of purchase or lease shall be subject to the approval of the reorganization court. * * *" The rights of the NH Trustee are thus given ample protection. The valuation principles set forth in the *New Haven Inclusion Cases, supra,* would obviously come into play at that point. And finally, as a practical matter, it is appropriate to point out that neither

 

this statute nor any other provision of law actually authorizes the Secretary to exercise any such option, or provides the funds for such purchase.

The final argument of the NH Trustee is addressed to the requirement of § 3(c) that the trustees' certificates are to be given "the highest lien and priority in payment under the Bankruptcy Act." But this merely restates existing law, and adds nothing to § 77(c) (3) of the Bankruptcy Act, the validity of which, as noted above, is not here challenged.

The foregoing discussion disposes of the various arguments advanced by the other objectors, the indenture trustees, and various stockholder interests. In addition, it should be pointed out that there is grave doubt that the individual shareholders of the Penn Central Company have standing to object at this time. The sole stockholder of the debtor is the parent company, which neither approves nor opposes the present application.

For the reasons set forth above, I have entered Order No. 124 granting the authorization requested by the Trustees.