**KENNECOTT COPPER CORPORATION,**
**Plaintiff-Appellee,**

v.

**CURTISS–WRIGHT CORPORATION,**
**Defendant-Appellant.**

**No. 1174, Docket 78–7187.**

United States Court of Appeals,
Second Circuit.

Argued June 21, 1978.
Decided Sept. 28, 1978.

---

David Klingsberg, New York City (Kaye, Scholer, Fierman, Hays & Handler, New York City, Allan M. Pepper, Steven J. Glassman and Barry Willner, New York City, of counsel), for defendant-appellant.

Marvin Schwartz, New York City (Sullivan & Cromwell, New York City, Richard J. Urowsky, Robert D. Owen and William H. Knull, III, New York City, of counsel), for plaintiff-appellee.

Before OAKES, VAN GRAAFEILAND and MESKILL, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Curtiss-Wright Corporation has appealed from a judgment of the United States District Court for the Southern District of New York entered in the midst of a proxy fight between Curtiss-Wright and Kennecott Copper Corporation. At issue was the election of directors to the board of Kennecott, in which Curtiss-Wright had become a minority shareholder. The judgment, dated May 1, 1978, permanently enjoined Curtiss-Wright from further solicitation of Kennecott proxies and from voting the shares and proxies it then held at the May 2, 1978, annual meeting of Kennecott. On May 2, 1978, prior to the meeting, this Court granted a stay of the district court's judgment and an expedited appeal. For reasons that follow, we have concluded that the judgment must, in substantial part, be reversed.

In 1968, Kennecott, the largest producer of copper in the United States, sought to diversify by acquiring Peabody Coal Company. This acquisition was attacked by the Federal Trade Commission on antitrust grounds, and in 1977, following the Commission's order to divest, Peabody was sold.

As consideration, Kennecott received $809 million in cash and some five per cent subordinated income notes due in 2007, which were in the face amount of $400 million but were carried on Kennecott's balance sheet at a value of $171 million. A number of shareholders urged the company to distribute the proceeds of the sale, either by making a cash tender offer for outstanding shares or by declaring an extraordinary cash dividend. Indeed, one shareholder commenced a shareholders' suit, the underlying purpose of which was to force such a distribution. Instead of acceding to these requests, Kennecott, in January 1978, purchased the Carborundum Company for $567 million in cash.

In November 1977, Curtiss-Wright, a diversified manufacturing company, decided to acquire an interest in Kennecott. By March 13, 1978, when Curtiss-Wright filed its Schedule 13D [1] with the Securities and Exchange Commission, it had acquired 9.9 per cent of the outstanding Kennecott shares at a cost of approximately $77 million. On March 15, officials of Curtiss-Wright met with Kennecott officials to determine whether they could work together, and Curtiss-Wright suggested the nomination of a joint slate of candidates for Kennecott's board which would give Curtiss-Wright's nominees a minority position on the board. When these overtures were rejected, Curtiss-Wright, on March 23, 1978, announced its own slate and a campaign platform which, in effect, took up the cause of the shareholders who had sought distribution of the Peabody proceeds. In essence, Curtiss-Wright proposed that Kennecott try to sell Carborundum at or above the $567 million which Kennecott had paid for it and use the proceeds and other Kennecott funds to make either a tender offer for half the outstanding Kennecott shares

at $40 per share, or a $20 per share cash distribution.

Kennecott did not wait for the battle lines thus to be drawn; it struck first. It had substantial holdings in the State of Utah. On March 21, 1978, acting through its local counsel, Kennecott induced that state to obtain an ex parte temporary restraining order in the state court enjoining Curtiss-Wright from purchasing any additional Kennecott shares or soliciting proxies anywhere in the United States.[2] On the following day Kennecott commenced the instant action in the District Court for the Southern District of New York.

Kennecott's original complaint alleged both securities and antitrust law violations arising out of Curtiss-Wright's acquisition of Kennecott stock. On April 5, 1978, Curtiss-Wright counterclaimed, alleging improper proxy solicitation by Kennecott. On April 17, 1978, the district court permitted Kennecott to amend its complaint to allege improper proxy solicitation by Curtiss-Wright. Each party sought injunctive relief. The trial commenced on April 24 and was completed on April 27.

The district court held that (a) Curtiss-Wright's proxy solicitations had violated section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Rule 14a–9(a) of the Commission, 17 C.F.R. § 240.-14a–9(a), but Kennecott's solicitations had not; (b) Curtiss-Wright's acquisition of Kennecott stock and the proposed election of a Curtiss-Wright director to the Kennecott board violated sections 7 and 8 of the Clayton Act, 15 U.S.C. §§ 18 and 19; and (c) Curtiss-Wright's acquisition of Kennecott stock, prior to the filing of its Schedule 13D, was not a "tender offer" for purposes of the Williams Act, 15 U.S.C. § 78n(d). The court enjoined Curtiss-Wright from

---

1. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C. § 78m(d)(1).

2. The Utah proceedings were based upon alleged violations of the Utah Take-Over Disclosure Act. On April 3, 1978, the state's action was dismissed for lack of personal jurisdiction over Curtiss-Wright, and that decision was affirmed by the Utah Supreme Court on April 5,

1978. Because Utah authorities persisted thereafter in their efforts to restrain Curtiss-Wright, and the district court below perceived a possible conflict between the state proceedings and its own jurisdiction under the federal Securities Exchange Act, it issued a preliminary injunction against further state activity. That order has not been appealed.

voting its shares and proxies, while permitting Kennecott's annual meeting to go forward. It deferred decision as to the appropriate relief for the antitrust violations.

On appeal, Curtiss-Wright challenges holdings (a) and (b). In connection with holding (b), Curtiss-Wright also argues that the district court erred in requiring it to go to trial on the antitrust issue without giving it adequate time to prepare. Finally, Curtiss-Wright contends that the relief granted by the district court was wholly inappropriate. Although Kennecott filed no cross-appeal, it now seeks to support the decretive portion of the district court's judgment by overturning holding (c).

## RULE 14a–9(a) DISCLOSURES

█ Rule 14a–9(a) prohibits solicitation by a proxy statement that is false or misleading with respect to a material fact or which omits to state a material fact needed to make other statements therein not false or misleading. This rule, a typical securities regulation, was enacted to implement a "philosophy of full disclosure." *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Cole v. Schenley Industries, Inc.,* 563 F.2d 35, 43 n. 17 (2d Cir. 1977). If full and fair disclosure is made, the wisdom and fairness of the program for which support is solicited are of tangential concern. *Santa Fe Industries, Inc. v. Green, supra,* 430 U.S. at 478, 97 S.Ct. 1292; *Popkin v. Bishop,* 464 F.2d 714, 720 (2d Cir. 1972).

Curtiss-Wright's program, which followed upon its investment of $77 million in Kennecott, was not created in a vacuum. Although its officers were not privy to the inner workings of Kennecott, they studied the annual reports of Kennecott and its competitors and publications of the financial and copper industries. Curtiss-Wright's executive vice-president analyzed Kennecott's balance sheet, made a number of suggestions as to how it could be improved, and prepared a pro forma balance sheet showing the effect of Curtiss-Wright's proposals. However, Curtiss-Wright's consideration of the effect of its proposed plan was limited

in nature, and it said so. Its April 4 proxy statement contained the following caveat:

Curtiss-Wright has not made a detailed study of the consequences to Kennecott of the program described above. It and the nominees believe, however, that the program would not result in Kennecott's inability to continue its metals operations or to finance them. This belief is based upon the following: In the approximately nine years during which Kennecott owned Peabody it contributed approximately $532 million to Peabody's capital. Peabody thus represented a very substantial cash drain on Kennecott during the period it operated Peabody. Despite this Kennecott was able to continue its metals operations and to finance them.

The sale of Peabody produced $809 million in cash plus $400 million in subordinated income notes which are now valued by Kennecott at $171 million. The Peabody sale thus yielded approximately $980 million in present value of assets, of which $567 million was invested in Carborundum. The program of the nominees, described above, envisages the sale of Carborundum for about the same price and a distribution equivalent to approximately $20 per share, or $663 million in the aggregate. This would leave the Kennecott metal operations with approximately $317 million more in assets than were available to them at the time Kennecott owned Peabody, and without the need for continued cash contributions to Peabody.

█ Despite this clear and unequivocal statement by Curtiss-Wright that it had not made a "detailed study of the consequences to Kennecott of the program," the district judge held that its "proxy materials misled shareholders to believe that the feasibility of the plan had been thoroughly studied." He based this holding on a belief that Curtiss-Wright's disclaimer of a "detailed study" did not fully disclose that it had not conducted a thorough investigation. In making a Rule 14a–9(a) violation out of this semantic differentiation between "detailed

study" and "thorough investigation," the district court erred.[3]

■ Rare indeed is the proxy statement whose language could not be improved upon by a judicial craftsman sitting in the serenity of his chambers. *See Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir. 1969). This is particularly so where the statement is prepared in the "hurly-burly" of a contested election. *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1300 n. 19 (2d Cir. 1973); *General Time Corp. v. Talley Industries, Inc.,* 403 F.2d 159, 162 (2d Cir. 1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969). "[N]ot every corporate counsel is a Benjamin Cardozo . . .", *Ash v. LFE Corp.,* 525 F.2d 215, 221 (3d Cir. 1975), and nit-picking should not become the name of the game. *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 267 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); *Electronic Speciality Co. v. International Controls Corp., supra,* 409 F.2d at 947.

Assuming for the argument that the words "thorough investigation" would have been more descriptive than "detailed study," the latter term conveyed a sufficiently accurate picture so as not to mislead. *See Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787, 800 (2d Cir. 1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). "There is no requirement that a material fact be expressed in certain words or in a certain form of language." *Richland v. Crandall,* 262 F.Supp. 538, 553–54 (S.D.N.Y.1967) (Mansfield, J.).

Fair accuracy, not perfection, is the appropriate standard. *Laurenzano v. Einbender,* 448 F.2d 1, 6 (2d Cir. 1971); *Allen v. Penn Central Co.,* 350 F.Supp. 697, 706 (E.D.Pa. 1972).

Kennecott found no need to clarify in its own proxy statements the language that Curtiss-Wright had used. In its proxy materials dated April 7, 1978, April 12, 1978, and April 21, 1978, Kennecott emphasized in bold-face type that Curtiss-Wright admitted it had "not made a detailed study of the consequences to Kennecott of the program."[4] Kennecott also advised its shareholders that Curtiss-Wright's president had admitted "he did not have the necessary imformation to determine what is in the best interests of Kennecott's shareholders" and that there was no indication that Curtiss-Wright's candidates had made any more of a "study" than had the president. We are satisfied that the lack of a thorough investigation by Curtiss-Wright was "thoroughly aired" in this contested proceeding, *see McConnell v. Lucht,* 320 F.Supp. 1162, 1164 (S.D.N.Y.1970), and that, as to this matter, there was no violation of Rule 14a–9(a).[5]

■ Because of the stay granted by this Court, Kennecott's annual meeting went on as scheduled; and this Court has been informed that management's slate was elected by a narrow margin. There is a strong likelihood, however, that the election results were influenced by the criticism of Curtiss-Wright contained in the district court's election-eve decision.[6] *See General Time Corp. v. Talley Industries, Inc.,* 283 F.Supp. 832,

---

3. In reviewing this holding, we are not bound by the "clearly erroneous" rule. "[T]he application of a legal standard to the facts is not a 'finding of fact' within the rule." *In re Hygrade Envelope Corp.,* 366 F.2d 584, 588 n. 4 (2d Cir. 1966); *see SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 15 (2d Cir. 1977).

4. In *General Time Corp. v. Talley Industries, Inc., supra,* 403 F.2d at 162, Judge Friendly observed that the failure of the other side "to correct alleged misstatements or rectify claimed omissions is some evidence that it did not regard them as material . . . ."

5. Kennecott contends that certain matters related to taxes, savings, debt increases, and the copper markets should have been included in Curtiss-Wright's proxy materials. However, the district court did not so hold. Moreover, it made no factual findings upon which such a holding could be based. It rejected Curtiss-Wright's proxy material on the one ground that we now hold to be erroneous.

6. The district judge did not limit his adverse comments to Curtiss-Wright's proxy statements. He stated, for example, that the feasibility of Curtiss-Wright's plan, viewed in its most favorable light, was highly doubtful.

837 (S.D.N.Y.), *aff'd.,* 403 F.2d 159 (2d Cir. 1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969); *Sherman v. Posner,* 266 F.Supp. 871, 874 (S.D.N.Y.1966). Equity demands, therefore, that the proceedings of the 1978 annual meeting be voided in whole or in part so as to permit a new election of directors.[7]

Because there must be another election in any event, we need not dwell upon Curtiss-Wright's allegations of improper solicitation by Kennecott. However, several of Curtiss-Wright's charges of wrongdoing merit comment. The first of these charges concerns alleged misstatements regarding Kennecott's inability to survive if Curtiss-Wright's plan was adopted. In a letter to its shareholders dated March 31, 1978, Kennecott stated:

> At the time of the Peabody divestiture your Board of Directors considered in depth what to do with the proceeds of the divestiture. To assist the Board it retained a major national investment banking firm to evaluate Kennecott's financial situation and opportunities.
>
> Among the alternatives considered was the possibility of a substantial direct distribution or the reacquisition of Kennecott shares. The Board concluded that this alternative would not be consistent with the maintenance of Kennecott as a viable company.

"Viable" in this context must mean capable of existing as an economic unit, *see Webster's Third New International Dictionary* 2548 (3rd ed. 1971), or able to generate enough income to pay expenses. *See In re Penn Central Transportation Co.,* 325 F.Supp. 302, 304 (E.D.Pa.1971). That this was the meaning that Kennecott intended is shown by its statement in its April 17 mailing that "the Board and Management believe no other cause of action [save diversification] was possible if the Company were to survive."

The district court held that, inasmuch as the Kennecott board and its financial consultant, Morgan Stanley & Co., had investigated and rejected a plan of cash distribution of the Peabody proceeds, the March 31 material did not misstate facts in this regard. We disagree. There is nothing in the board minutes or the report of Kennecott's investment banking firm indicating that a conclusion concerning non-viability was reached. Moreover, Kennecott's board chairman conceded at the trial that the board did not examine the question whether the use of the Peabody proceeds for any other purpose except diversification was possible if the company was to survive. A conclusion reached by a company's board of directors that the company will not survive a proposed change is obviously a material matter. It should not be misstated.

Curtiss-Wright also contends that Kennecott misstated facts concerning the calling of certain loans. On March 31, 1978, just after the proxy contest had begun, Kennecott negotiated a new $450 million line of credit with a consortium of banks, against which it borrowed $234 million. This agreement contains several negative covenants, some of which would be breached if Curtiss-Wright's program were adopted. The agreement also provides that, if such a breach occurs, any bank holding forty per cent or more of the notes outstanding "may" terminate the bank's commitments and declare the entire principal to be due and payable.

On April 12, 1978, Kennecott advised its shareholders that adoption of the Curtiss-Wright program would result in a default under the loan agreement and would "trigger" the repayment of the $234 million. In its April 17 mailing Kennecott said that the sale of Carborundum and the distribution of the proceeds would result in a default and that "current borrowings would have to be repaid." The record discloses that Kenne-

---

**7.** The district court should determine, with the aid of counsel, whether the 1978 annual meeting must be voided in its entirety in order to effectuate the purposes of this decree. It appears that all of Kennecott's successful candidates for election to the board were holdover board members. They may, of course, continue to act in this capacity until a new board is elected.

cott had attempted unsuccessfully to induce the major lending banks to sign a letter stating that, if requested to waive the covenants in question, they would refuse and, if Curtiss-Wright's program were carried out, they would require immediate repayment of their loaned funds. The shareholders were never notified that this conference took place.

The district court ignored Curtiss-Wright's argument that the above quoted words in Kennecott's proxy solicitations were misleading, holding only that the record supported Kennecott's statements that the Curtiss-Wright plan would breach certain negative covenants in the credit agreement. The question, however, was not whether the covenants would be breached, but whether the banks "would" require repayment of the loans. It seems to us that Kennecott was less than forthright in its disclosures on this point.

Curtiss-Wright's final complaint regarding Kennecott's proxy materials involves an alleged misstatement of figures. Curtiss-Wright's program envisioned the distribution to Kennecott shareholders of $663 million of the $980 million derived from the sale of Peabody, which, Curtiss-Wright stated, would leave an unused balance of $317 million. In Kennecott's mailing of April 12, 1978, it stated that Curtiss-Wright was ignoring the fact that $235 million of the Peabody proceeds had been used to reduce indebtedness. The mailing then continued:

> This simply means that even if all of the opposition group's other premises are assumed to be correct and constant, then without this $235,000,000, in order for Kennecott to repurchase one-half of its outstanding stock with the resources assumed by the opposition group's soliciting material, the purchase price would have to be reduced by more than $14.17 per share—from the promised $40.00 to less than $25.83 per share.[8]

What Kennecott was saying, in a somewhat convoluted fashion, was that, inasmuch as $235 million had been used to reduce indebtedness, the company would not end up with a balance of $317 million unless it paid no more than $25.83 per share for redeemed stock. We would not endorse this poor, or perhaps clever, choice of language as a Rule 14a–9(a) model. However, we think that Curtiss-Wright's characterization of it as "false and misleading" puts the matter too strongly. See Electronic Speciality Co. v. International Controls Corp., supra, 409 F.2d at 948.

Curtiss-Wright does not contend that Kennecott should have been unconditionally enjoined from voting its proxies at the 1978 annual meeting because of its alleged wrongful statements. Indeed, such a contention would be inconsistent with Curtiss-Wright's argument that the district judge erred in granting such drastic relief against it. The appropriate remedy, says Curtiss-Wright, would have been to adjourn the annual meeting and permit resolicitation, because then the shareholders who opted for the wrongdoing party would not have been disenfranchised. See SEC v. May, 134 F.Supp. 247, 258 (S.D.N.Y.1955), aff'd., 229 F.2d 123 (2d Cir. 1956); Willoughby v. Port, 277 F.2d 149 (2d Cir. 1960); 2 L. Loss, Securities Regulation 958 (2d ed. 1961). This, in effect, is the remedy we now provide by ordering a new election.

The district court will make the necessary orders to see that a new election is promptly scheduled, that further solicitation of proxies by both parties is permitted, and that proxy materials used in the solicitation comply with SEC rules and the decision of this Court. See Dillon v. Berg, 326 F.Supp. 1214, 1235 (D.Del.), aff'd, 453 F.2d 876 (3d Cir. 1971).

### THE SECTION 7 CLAIM

■ Curtiss-Wright owns approximately two-thirds of the common stock of Dorr-Oliver, Inc., which in turn owns approximately two-thirds of the common stock and all of

---

8. Kennecott arrived at the figure of $14.17 by dividing $235 million by a figure representing 50% of its outstanding shares.

the preferred stock of National Filter Media Corp. Curtiss-Wright has no directors on National's six-man board; Dorr-Oliver has three. National is engaged in the manufacture of fabric filter bags. Its sales for 1977 were $3.1 million. The Filter Media Division of Carborundum also sells fabric filter bags. Its 1977 sales were $6.5 million.[9]

In Kennecott's original complaint it alleged that Curtiss-Wright's acquisition of control over it might substantially lessen competition between National and Carborundum or tend to create a monopoly in violation of section 7 of the Clayton Act, 15 U.S.C. § 18. One month after this charge was levied against it, Curtiss-Wright was forced over its objection to go to trial on this complex issue.

Curtiss-Wright tried in vain to convince the district judge that it needed more time to prepare. It pointed out that the court could not give proper consideration to Kennecott's antitrust allegations until the pertinent market, in terms of both product and area, was defined. In order to establish what the product market was, Curtiss-Wright wanted to explore the factors held to be pertinent in *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *i. e.,* the product's peculiar characteristics and uses, the interchangeability of use or the cross-elasticity of demand between the product and substitutes for it, the uniqueness of production facilities, the distinctiveness of customers and prices, the sensitivity of product sales to price changes, the specialization in sales by the product's vendors, and the industry or public recognition of the market as a separate economic entity.

Determination of the geographic market, Curtiss-Wright argued, required development of facts as to the area of effective competition within which the parties operated, *i. e.,* that area in which Curtiss-Wright's acquisition would have a direct and immediate effect on competition.

*United States v. Philadelphia National Bank,* 374 U.S. 321, 357, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Development of these facts, it said, required exploration of such factors as the marketing regions in which the various sellers operate, the areas to which customers can practicably turn for supplies, and the presence or absence of barriers to expansion in these areas.

In short, Curtiss-Wright wished to develop a complete picture of the market, its "structure, history and probable future," as the "appropriate setting for judging the probable anticompetitive effect" of its stock acquisitions. *United States v. General Dynamics Corp.,* 415 U.S. 486, 498, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974) (citing *Brown Shoe Co. v. United States, supra* ). This required more than an "estimation" of the market shares of the parties. It required reliable data as to market concentration, ease of entry into the market, and trends toward or away from concentration. This information, Curtiss-Wright contended, could be secured only through discovery of third-party buyers, sellers, and potential sellers.

Needless to say, Curtiss-Wright was not given adequate opportunity to develop the facts. Indeed, it was unable even to complete its discovery of Kennecott. Nonetheless, its application for a continuance of the entire trial or, in the alternative, a severance and subsequent separate trial of the antitrust claims pursuant to Fed.R.Civ.P. 42(b), was denied. Citing authorities such as *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551 (2d Cir. 1977), and *Gavino v. Mac-Mahon,* 499 F.2d 1191 (2d Cir. 1974), Curtiss-Wright contends that this denial deprived it of its constitutional right to a fair trial. This troublesome issue is one we need not decide. Because the evidence introduced during the expedited three-day trial was insufficient to support the district court's judgment, a new trial on the antitrust issue is required.

---

9. Curtiss-Wright's total sales for 1977 were approximately $310 million; Kennecott's were approximately $1.2 billion.

Kennecott's proof on this issue consisted of the testimony of a single Carborundum employee, which took less than two hours to complete, and the reading of eight pages of testimony from the deposition of a National Filter employee. Kennecott's witness, the marketing manager of Carborundum's Filter Media Division, testified that filter bags are used in industries where dust pollution is a problem. They are constructed of various materials, including fiberglass, polyester, acrylic, cotton, polypropyle, Aramid, and Teflon. Because each bag that goes into a dust collector must be of a specific design and construction, there is a great variety of bags, and one bag will not necessarily substitute for another. The record does not disclose to what extent National, Carborundum, and other manufacturers make similar bags for similar equipment or to what extent their products are interchangeable. It provides little or no enlightenment concerning sales methods, product distribution, prices, consumer distinctiveness, location and concentration, and regional availability of supplies and replacements.

In the dim light shed by this paucity of proof, the "estimates" of Kennecott's witness that five firms control eighty per cent of the "U.S. market for fabric filter bags" has little meaning.[10] There simply has been no adequate definition of the "market" into which the estimated but undescribed product sales of these companies are being fit.

For example, one firm may be concentrating on the sale of specially designed filters to the coal industry; another may be manufacturing entirely different filters for the cement industry. Without a more complete development of the facts, it is too simplistic to treat all manufacturers as competitors, selling the same product in an all-encompassing filter bag market.

Kennecott contends that once it has shown an undue market share and a significant increase in concentration, the burden is on Curtiss-Wright to produce evidence that anti-competitive effects are unlikely, *United States v. Phillipsburg National Bank,* 399 U.S. 350, 366, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970), or that the concentration figures do not accurately depict the economic characteristics of the market, *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 631, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). This argument assumes several factors which are not present in this case. It assumes that the market has been adequately defined. It assumes that the market concentration figures upon which Kennecott relies are descriptive and reliable. Finally, it assumes that Curtiss-Wright, in the inordinate rush to trial, has not been deprived of the opportunity to meet the burden of proof Kennecott now seeks to impose upon it.

It should be remembered also that a merger of National and the Filter Media

10. Kennecott's witness "estimated" that National's share was approximately 10% and Carborundum's 15%. The witness admitted, however, that he had no specific knowledge of the sales of any company other than his own or of the total sales of filter bags in the United States. Based on the records of his own company, he estimated that 10% of the flange to flange sales value of a fabric filter is in the filter bag. Although admitting that he had no specific knowledge of competitive cost structures, he then extrapolated these percentages into industry-wide sales of filter equipment to arrive at his estimates of original equipment filter bag sales. In so doing, he simply adopted an estimate of the Industrial Gas Cleaning Institute that the sales volume of non-members was 20% of the total for the industry. He then estimated a three-year life cycle for each bag to arrive at a figure for replacement sales.

In making these calculations, the witness did not explain how he adjusted for the fact that a baghouse, the structure into which impure gas is piped for filtration, may contain anywhere from 200 to 3,000 bags. Neither did he elucidate how he accounted for the difference in cost of the fabrics from which the bags were made. Finally, he offered no figures to show how he arrived at a life cycle of three years, which he apparently applied to all fabrics, regardless of durability.

According to the transcript, the witness described the foregoing as the "mythology" used by *Carborundum in calculating the market-place.* This was probably an error in transposition in that the word actually used was "methodology." However, the former term seems to be more descriptive. In any event, these calculations were a completely inadequate foundation upon which to base a judgment nullifying a $77 million investment.

Division of Carborundum is not contemplated. The key plank in Curtiss-Wright's platform is the sale of Carborundum. If, for some reason, the sale does not take place, National and Filter Media will continue to operate as separate suppliers of air filter bags. There is little in the record to demonstrate the probability that this will harm either the competitors of the two companies or Kennecott itself. We are not impressed by Kennecott's contention that membership by a Curtiss-Wright director on the Kennecott board will give National access to secret proprietary knowledge and technological advances possessed only by Filter Media.[11] Kennecott has not made even an in camera disclosure of what the secret technological advances are. Assuming, however, that trade secrets do exist and that they will be discussed at Kennecott board meetings, any Curtiss-Wright people on the board can absent themselves during these discussions to avoid any possible conflict of interest. If necessary, the pirating of Filter Media's trade secrets can be prevented by appropriate court action without demolishing Curtiss-Wright's entire program in the process.

For the foregoing reasons, we conclude that a new trial on the antitrust issues is required. Without in any way espousing a program of pre-trial preparation which entails prolonged and unnecessary discovery, we suggest that the parties be given a reasonable opportunity, of which they should take advantage, to uncover and present more complete and reliable data than was offered at the first trial. The retrial need not precede the new election of directors that we have ordered. *See Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 868–70 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *FTC v. PepsiCo, Inc.,* 447 F.2d 24, 28–31 (2d Cir. 1973).

## THE SECTION 8 CLAIM

Section 8 of the Clayton Act, 15 U.S.C. § 19, provides in pertinent part that no person shall be a director of two competing corporations if the elimination by agreement of competition between them would violate any provisions of the antitrust laws. The district court held that the election of a Curtiss-Wright director to the Kennecott board would violate this statute. The court reached this conclusion by laying down a general rule that section 8 prohibits interlocking directorships between parent companies whose subsidiaries are competitors.

This general rule is not supported by the language of the statute, its legislative history,[12] or the few pertinent cases. *See United States v. Cleveland Trust Co.,* 392 F.Supp. 699 (N.D.Ohio 1974), *aff'd mem.,* 513 F.2d 633 (6th Cir. 1975); *Paramount Pictures Corp. v. Baldwin-Montrose Chemical Co.,* 1966 Trade Cas. ¶ 71,678 (S.D.N.Y.1966). We decline to adopt it. We need not conjecture about the possible application of the statute to a parent corporation that closely controls and dictates the policies of its subsidiary. *See United States v. Cleveland Trust Co., supra,* 392 F.Supp. at 712. Here, the proof is undisputed that no one from Curtiss-Wright or from its subsidiary, Dorr-Oliver, has ever told Dorr-Oliver's subsidiary, National Filter, how to run its business.

The district court's finding of a potential section 8 violation is reversed.

## THE WILLIAMS ACT CLAIM

Section 3 of the Williams Act, Pub.L. 90–439, 82 Stat. 454 (1968), amended section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, by adding subsections (d), (e), and (f). Subsection (d) prohibits the making of a tender offer for any class of a registered stock if, after consummation thereof, the offeror would own more than five per cent of the class, unless a Schedule

---

11. The filter bag industry is largely a sewing machine operation; bags are manufactured in accordance with purchasers' specifications. Research and development is minimal, and patents are rare.

12. For a discussion of indirect interlocks and legislative proposals, see 3 J. vonKalinowski, *Antitrust Laws and Trade Regulation* § 20.-02[3][a] (1977).

13D form is first filed with the SEC.[13] If ownership of more than five per cent is obtained through more customary modes of stock acquisition, the Schedule 13D form must be filed within ten days after the five per cent figure is reached. 15 U.S.C. § 78m(d)(1). Curtiss-Wright filed its Schedule 13D on March 17, 1978, which was within ten days of the time it had acquired five per cent of Kennecott's stock. Accordingly, unless it had acquired this stock by means of a tender offer, it was not in violation of section 78n(d).

The trial court rejected Kennecott's contention that Curtiss-Wright's acquisition had been made by means of a tender offer. The district judge found that Curtiss-Wright had purchased substantially all of the stock on national exchanges; that although one of Curtiss-Wright's brokers had solicited fifty Kennecott shareholders off the floor of the exchange, the sales were consummated on the floor. He also found that another broker had solicited approximately a dozen institutional holders of Kennecott, consummating an unspecified number of sales off the floor of the exchange. He found that the potential sellers were merely asked whether they wanted to sell. They were offered no premium over the market price and were given no deadline by which to make their decision. He also found that the off-market purchases were made largely from sophisticated institutional shareholders who were unlikely to be forced into uninformed, ill-considered decisions. He concluded that Curtiss-Wright had not made a tender offer prior to the filing of its Schedule 13D.

█ Although Kennecott did not appeal from the district court's dismissal of its claim alleging violation of section 78n(d), it now asks this Court to affirm the grant of injunctive relief by reversing the district court's dismissal of this claim. Not surprisingly, we are met at the outset by Curtiss-Wright's contention that Kennecott, having filed no cross-notice of appeal, is not properly before this Court. We disagree. An "[a]ppellee may, without taking a cross-ap-

peal urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court . . . ." *United ed States v. American Railway Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924). He "may sustain [the district court's] judgment on any ground that finds support in the record." *Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957); *see Cook v. Hirschberg,* 258 F.2d 56, 57 (2d Cir. 1958); *Reserve Insurance Co. v. Brokerage Surplus Corp.,* 570 F.2d 487, 491 (3d Cir. 1978); *Blackwelder v. Millman,* 522 F.2d 766, 771–72 (4th Cir. 1975); 9 *Moore's Federal Practice* ¶ 204.-11(3) (2d ed. 1975). Because Kennecott seeks to support the decree in its favor on this basis, we have considered its arguments. Having done so, we affirm the district court's holding.

█ Although the Williams Act does not define the term "tender offer," the characteristics of a typical offer are well-recognized. They are described in the House Report of the Committee on Interstate and Foreign Commerce, which held hearings on the proposed Act.

> The offer normally consists of a bid by an individual or group to buy shares of a company—usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met.

H.R.Rep. No. 1711, 90th Congress, 2d Sess., reprinted in [1968] U.S.Code Cong. & Admin.News, pp. 2811, 2811.

This definition of a conventional tender offer has received general recognition in the courts. *See, e. g., Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 597 n. 22 (5th Cir.), *cert. denied,* 419 U.S. 873, 93 S.Ct. 134, 42 L.Ed.2d 113 (1974); *Dyer v. Eastern Trust and Banking Co.,* 336 F.Supp. 890, 908 n. 24 (D.Maine 1971); *Water & Wall Associates v. American Consumer Industries, Inc.,*

---

**13.** 15 U.S.C. § 78n(d)(8) sets up certain exceptions to this rule which are not relevant here.

[1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,943 at 93,759 (D.N.J. Apr. 19, 1973). Several courts and commentators have taken the position, however, that other unique methods of stock acquisition which exert pressure on shareholders to make uninformed, ill-considered decisions to sell, as is possible in the case of tender offers, should be treated as tender offers for purposes of the statute. *See Smallwood v. Pearl Brewing Co., supra,* 489 F.2d at 596–99; *Cattlemen's Investment Co. v. Fears,* 343 F.Supp. 1248 (W.D.Okl.1972); Note, *The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934,* 86 Harv.L.Rev. 1250, 1275–78 (1973). The Second Circuit has not yet moved this far. *D–Z Investment Co. v. Holloway,* [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,771 at 96,562 (S.D.N.Y. Aug. 23, 1974).

Although broad and remedial interpretations of the Act may create no problems insofar as the antifraud provisions of subsection (e) of section 78n are concerned, this may not be true with regard to subsections (d)(5)–(d)(7). Subsection (d)(5) provides that securities deposited pursuant to a tender offer may be withdrawn within seven days of the publication or delivery to shareholders of the tender offer or at any time after sixty days from the date of the original tender offer. Subsection (d)(6) requires offerors to purchase securities on a pro rata basis where more are tendered than the offeror is bound or willing to take. Subsection (d)(7) provides that where the offeror increases the offering price before the expiration of his tender offer, those tenderers whose stock has already been taken up are entitled to be paid the higher price. It seems unlikely that Congress intended "tender offer" to be so broadly interpreted as to make these provisions unworkable. *See Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 356 F.Supp. 1066, 1073–74 (S.D.N.Y.), *aff'd,* 476 F.2d 687 (2d Cir. 1973).

In any event, we know of no court that has adopted the extremely broad interpretation Kennecott urges upon us in this case. Kennecott's contention, as we understand it, is that whenever a purchaser of stock intends through its purchases to obtain and exercise control of a company, it should immediately file a Schedule 13D. Kennecott conceded in the trial court that no pressure was exerted on sellers other than the normal pressure of the marketplace and argued there and here that the absence of pressure is not a relevant factor. Kennecott also conceded in the trial court that no cases supported its argument and that it was asking the court to "make new ground." The district court did not err in refusing to do so. *See Copperweld Corp. v. Imetal,* 403 F.Supp. 579, 597–98 (W.D.Pa. 1975).

Kennecott's interpretation would render the five per cent filing provisions of section 78m(d)(1) meaningless except in cases where the purchaser did not intend to obtain a controlling interest. It would also require courts to apply the withdrawal, pro rata, and increased price provisions of section 78n(d)(5)–(7) to ordinary stock purchases, a difficult if not impossible task.

The fact that several of Curtiss-Wright's purchases were negotiated directly with financial institutions lends no force to Kennecott's contentions. *See Financial General Bankshares, Inc. v. Lance,* [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,403 at 93,429 (D.D.C. Apr. 27, 1978); *Nachman Corp. v. Halfred, Inc.,* [1973–1974 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,455 at 95,590 (N.D.Ill. Jul. 13, 1973); 1 A. Bromberg, *Securities Law* 6.3(333) (1969); *cf. Contreras v. Tweedy, Browne & Knapp,* 76 F.R.D. 39, 44–45 (S.D.N.Y.1977).

If this Court is to opt for an interpretation of "tender offer" that differs from its conventional meaning, this is not the case in which to do it.

## DISPOSITION

The portion of the district court's judgment that dismissed Kennecott's claims under the Williams Act is affirmed. The portion that found a violation of section 8 of the Clayton Act is reversed, and Kennecott's claim based on such alleged violation

is dismissed. The portion that found a violation of section 7 of the Clayton Act is reversed, and the matter is remanded to the district court for a new trial on this issue. Finally the district court is directed to void the 1978 annual Kennecott meeting in whole or appropriate part and order that a new election of directors be held promptly with a proper resolicitation of proxies. Costs of this appeal are awarded to appellant, Curtiss-Wright.